**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHESTINE GAJOS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No: 14-cv-9282 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND OPINION ORDER**

This matter is before the Court on Plaintiff Chestine Gajos's motion seeking review of the Commissioner of Social Security's decision to deny her application for disability benefits [1, 27]. Plaintiff asks the Court to reverse the decision of the Administrative Law Judge ("ALJ") denying her benefits and remand the case to the Social Security Administration ("SSA") with instructions to grant Plaintiff's application for disability benefits. For the reasons stated below, the Court grants in part Plaintiff's request and remands this case for further proceedings consistent with this opinion.

**I.      Background**

**A.      Procedural History**

In April 2012, Plaintiff filed applications for disability insurance benefits and supplemental security income, alleging that she became disabled on June 3, 2010. [Administrative Record ("AR"), at 20; see also 32, at 1.] Plaintiff's applications were denied initially on July 11, 2012 and upon reconsideration on October 12, 2012. [AR, at 20.] Plaintiff testified at a hearing before an ALJ on April 11, 2013. [AR, at 20.] On April 29, 2013, the ALJ issued a decision concluding that Plaintiff was not disabled because she could perform a

significant number of jobs in the national economy.  [AR, at 32.]  Plaintiff appealed this decision

to the Appeals Council of the SSA on June 4, 2013, arguing that the ALJ did not fully take into

account the testimony of the VE, who testified that there would be no jobs available to someone

in Plaintiff's position who had to be absent from work an average of one and a half days per

month for medical treatment.  [AR, at 14–15.]  On July 1, 2014, the Appeals Council denied

Plaintiff's request for review of the ALJ's decision.  [AR, at 2–5; see also 27, at 2.]  Thus, the

ALJ's decision became the final decision of the Commissioner, reviewable by this Court.  20

C.F.R. § 404.981; *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  Plaintiff filed a timely

complaint [1] in this Court on November 19, 2014.

### B.  Factual Background

Plaintiff was born on April 4, 1961 and was forty-nine years old on her alleged disability

onset date of June 3, 2010.  [See AR, at 31.]  She has a high school education and two years of

college education and is able to communicate in English.[1]  [AR, at 31, 69.]  Plaintiff has past

work experience as a retail manager.  [AR, at 31.]  In 2009 and 2010, Plaintiff worked at

Homeowner's Bargain Outlet as an assistant furniture manager.  [AR, at 42.]  Before that, she

worked at Burlington Coat Factory.  [AR, at 42.]  Plaintiff testified that she stopped working

after having two accidents while working at Homeowner's Bargain Outlet.  [AR, at 42–44.]

### C.  Relevant Medical Evidence

Plaintiff alleges disability due to three herniated discs in the back, an injured left hip,

shoulder and neck, pain in the right buttock cheek, and a left arm injury.  [AR, at 213.]  These

injuries stem from two accidents that allegedly occurred at her last job at Homeowner's Bargain

---

[1] The Court notes that the ALJ's opinion states that Plaintiff has "at least a high school education," [AR, at 31], whereas the transcript of the hearing before the ALJ indicates that Plaintiff also has two years of college education [AR, at 69], and a psychology consultant's report in the record states that Plaintiff has an associate's degree [AR, at 364].

Outlet. [AR, at 25, 42–44.] On December 14, 2009, Plaintiff slipped on dirt in a stockroom, fell, and fractured her cervical spine and hurt her back. [AR, at 25, 43, 287, 302.] Plaintiff testified that she continued to work after this first accident even though she was in pain. [AR, at 43.] The second accident occurred on March 16, 2010. [AR, at 25, 43.] A coworker was helping Plaintiff move a fifty-to-sixty pound table down from a rack when the table slipped out of the coworker's hands. [AR, at 287; see also AR, at 43.] Plaintiff was able to catch the table just as it hit her forehead, but Plaintiff's head was pushed back by the table. [AR, at 287.] She was able to control the table and put it on the floor. [AR, at 287.] Plaintiff testified that catching the table caused nerve damage to her left arm and shoulder to her neck. [AR, at 43.]

On March 4, 2010, Plaintiff saw Dr. Griffin, her treating physician, who reviewed an x-ray of her hip and back. [AR, at 553–54.] He noted no fracture, no significant arthritis of the back, and "no evidence of acute osseous abnormalities to the hips" and stated that there "may be some very minimal degenerative changes to the right hip." [AR, at 553.] Dr. Griffin referred Plaintiff to physical therapy. [AR, at 582.] She was evaluated by a physical therapist on March 17, 2010 for back pain and pelvic pain, and the physical therapist noted that her pain was "intermittent and variable, rated 0/10 to 8/10" and that "[s]ymptoms have been gradually improving." [AR, at 582.] The physical therapist's assessment states:

> Patient presents with signs and symptoms of a right posterolateral derangement per McKenzie classification in the lumbar spine. There may also be some residual pain due to her fall in December 2009. She has significant tenderness under the right ischial tuberosity. There is no pain in this area except when she is sitting on it and applying pressure to that specific area. She should respond well to mechanical diagnosis and therapy. There is some question regarding patient's compliance with therapy due to her cancelling to schedule appointments for evaluation, and she is unwilling to schedule more than 1 followup [sic] appointment at a time due to her busy schedule.

[AR, at 583.] The physical therapist stated that Plaintiff was to be seen twice per week for up to ten visits as needed. [AR, at 583.] The final report from this physical therapist, dated May 5,

2010, states that Plaintiff had attended seven physical therapy sessions since March 17, 2010 but that she had been noncompliant, frequently late for appointments, and cancelled three out of ten scheduled appointments. [AR, at 585.] The report states that greater than thirty minutes of driving caused Plaintiff pain, but that she did not consistently use lumbar support when driving, despite the fact that this consistent use of lumbar support was one of her physical therapy goals. Plaintiff had restored eighty percent of her range of motion for forward bending and back pending, but the pain was intermittent. Plaintiff was discharged from physical therapy. [AR, at 585.]

On June 7, 2010, Plaintiff complained of right back pain and discomfort in the left elbow at Good Samaritan Hospital emergency department. [AR, at 287.] "Re-evaluation in the emergency department suggested that the left arm pain was chronic but that physical examination was unremarkable and that [Plaintiff] might have tendinitis." [AR, at 287.] On June 16, 2010, Plaintiff saw Dr. Griffin, who completed a workers' compensation work status report indicating that Plaintiff was "unable to perform any work at this time" due to "sciatica back and arm pain" and prescribed ibuprofen and Norco. [AR, at 288, 557.] An x-ray of the lumbar spine reviewed by Dr. Griffin on June 28, 2010 revealed "[m]inimal disc bulge at L3-L4 with minimal bilateral neural foraminal narrowing." Dr. Griffin recommended that Plaintiff see Dr. Heller about this. Dr. Griffin also noted "posterior central disc protrusion at L5-S1 without significant central canal stenosis or neural foraminal narrowing" but stated that "[t]his isn't as big of a problem." [AR, at 546.] On June 30, 2010, Plaintiff saw Dr. Heller, who thought that Plaintiff might have left lateral epicondylitis (also known as "tennis elbow"). [AR, at 288.]

On August 9, 2010, Plaintiff received a physical therapy evaluation for her arm pain. [AR, at 618.] The physical therapy report notes that Plaintiff rates her pain as 4/10 to 9/10, that

the pain is constant and variable, and that Plaintiff also complains of numbness, tingling, and some weakness in the left arm. [AR, 618.] The report states that "Patient has mildly decreased strength in her left upper extremity due to pain with resisted movements in all directions. Left arm strength grossly graded 4/5. Right grip strength 45 pounds and left grip strength 10 pounds." [AR, at 618.] The physical therapist stated that Plaintiff was to be seen two times per week for up to twelve visits if needed. [AR, at 619.] A physical therapy progress report dated September 16, 2010 states that Plaintiff completed eleven visits from August 9, 2010 to September 16, 2010. [AR, at 615.] The report notes that all of Plaintiff's goals have been met or partially met and that her left grip strength had been increased from ten to twenty pounds of force. The report indicates that Plaintiff did not rate her pain but claims that it is "better" and that "she's able to do a lot of activities at this time." The report states, however, that "Patient is not progressing adequately with regard to symptoms. She is making strength gain which does not seem to be reflected in grip strength measures." [AR, at 615.]

On August 25, 2010, Plaintiff had a follow-up visit with Dr. Griffin. Dr. Griffin noted that Plaintiff's arm pain was at a level of 7/10 to 10/10 and that it "hurts in finger and mostly in elbow and goes up to neck and back." [AR, at 354.] He also noted that Plaintiff has had back pain since her fall in December 2009 and that it hurts continuously, despite physical therapy and medication. [AR, at 354.] Plaintiff rated her back pain as 5/10 to 7/10 and noted that "it is better and lower in pain." Dr. Griffin filled out a workers' compensation work status report indicating that Plaintiff was "unable to perform any work at this time" due to epicondylitis, elbow pain, and back pain. [AR, at 559.] On September 23, 2010, she had another follow-up with Dr. Griffin. [AR, at 351.] Dr. Griffin's report stated that Plaintiff "is ready to go back to work" on October 4, 2010, but that she would need work restrictions. [AR, at 352.] Dr. Griffin also filled out a

workers' compensation work status report noting Plaintiff's diagnosis of epicondylitis, elbow pain, and back pain, and indicating that Plaintiff could return to work on October 4, 2010 with the following restrictions: occasional lifting and carrying restricted to fifteen pounds, occasional climbing stairs and ladders, occasional squatting, bending, and kneeling, occasional grasping and clasping, and no limiting on sitting, standing, or walking. [AR, at 560.]

On October 21, 2010, Plaintiff underwent an independent medical evaluation by Dr. Daniel Nagle for insurance purposes. Dr. Nagle noted that Plaintiff had been going to therapy and is "definitely better" since the March 2010 accident. [AR, at 288.] Dr. Nagle recorded that Plaintiff "states her strength is better but she is not as strong as she once was." [AR, at 288.] Further, "[f]oward flexion causes discomfort in the shoulder and arm," but "[e]xtension of the wrist and fingers against resistance produces no pain" and "[f]lexion of the wrist and fingers while the forearm is pronated produces no pain." [AR, at 288–89.] Dr. Nagle also stated that he believed Plaintiff "suffered a strain to her left biceps and left upper extremity in general," "may have suffered an injury to her cervical area," and "has some evidence of shoulder impingement." [AR, at 289.] He noted that Plaintiff "is not able to work without restrictions at this point" and that "she is clearly unable to do any heavy lifting using her left upper extremity though she is getting stronger." [AR, at 289.]

On November 1, 2010 Plaintiff underwent independent medical evaluation by Dr. Goldberg. [AR, at 716.] Plaintiff reported lower back pain but stated that she has improved since her December 2009 accident. Dr. Goldberg stated that based on the records he reviewed, "it appears the patient did sustain an injury to her lumbar and pelvic region. I feel it is reasonable for her to proceed with a sacroiliac joint injection. If this provides relief, she can

work full duty and would be maximum medical improvement." [AR, at 719.] He also stated that "[a]t the present time, she can return to work with a 25-pound lifting restriction." [AR, at 719.]

Plaintiff had several follow-up visits with Dr. Griffin over the next few months. Dr. Griffin's report from November 4, 2010 indicated that Plaintiff stated that "[s]he is not ready to go back to work; was going to return in October 2010 but Harford insur [sic] company wanted 2nd opinion And [sic] they are doing more tests-she will get cortisone shot in back." [AR, at 347.] According to Dr. Griffin, Plaintiff's return to work was "up in the air [a]nd should come from her work comp doctors." [AR, at 348.] However, Dr. Griffin also filled out a workers' compensation work status report on November 4, 2010, which indicates that Plaintiff was "unable to perform any work at this time" due to "epicondylitis, elbow pain, back pain, insomnia, and depression." [AR, at 561.] On December 14, 2010, her overall status was unchanged. [AR, at 343.]

On February 16, 2011, Dr. Griffin noted that she was sleeping about eight hours and that her concentration was better. [AR, at 337–38.] Dr. Griffin also filled out a workers' compensation work status report indicating that Plaintiff was "unable to perform any work at this time" due to epicondylitis, below pain, and back pain. [AR, at 563.] On February 21, 2011, Plaintiff saw Dr. Park, who noted Plaintiff's shoulder and elbow pain and problems with Plaintiff's central discs. [AR, at 564.] Dr. Park completed a workers' compensation work status report indicating that Plaintiff could return to work with the following limitations: restricted to two pounds of occasional carrying and lifting, no climbing ladders or stairs, no squatting, bending, or kneeling, and no grasping or clasping. [AR, at 564.] On April 13, 2011, Plaintiff saw Dr. Griffin, who noted that Plaintiff was sleeping less, about six interrupted hours, but that Zoloft was helping. [AR, at 334.] Dr. Griffin also filled out a workers' compensation work

status report indicating that Plaintiff was "unable to perform any work at this time." [AR, at 565.] On June 15, 2011, Dr. Griffin noted that Plaintiff was walking six miles per day but sleeping less, and he filled out a workers' compensation work status report indicating that Plaintiff was "unable to perform any work at this time." [AR, at 330, 566.]

On June 29, 2011, Plaintiff reported to Dr. Griffin that she had been injured twice by her husband and that she was having headaches from these injuries. [AR, at 326.] Dr. Griffin noted she was neurologically intact, had no focal, motor, or sensory deficits, and that her cranial nerves were intact, but that she had bruising over her right temple. [AR, at 327.] He also noted that she had gone to the police, obtained a restraining order, and was proceeding with a divorce. [AR, at 326.] On July 6, 2011, Plaintiff received a CT scan of the head, and there was "no evidence of a skull fracture or blood on the brain." [AR, at 535.] On July 29, 2011, Plaintiff received an x-ray of the left shoulder, which revealed no evidence of full-thickness rotator cuff tear, mild tendinopathy of the supraspinatus and infraspinatus tendons, abnormally thickened middle glenohumeral ligament, and mild posterior subluxation of the humeral head. [AR, at 532–33.] An MRI of the cervical spine on July 29, 2011 revealed mild spondylosis at C5-6 with mild left anterolateral recess and left foraminal stenosis. [AR, at 530.]

On August 2, 2011, Plaintiff received treatment at a spine center. [AR, at 424–25.] She complained of continued pain to the left side of her neck and left arm. She rated her pain as a 6/10. The doctor sent her to pain management for a "trial of ESI at left C5-6 region to see if pain is improved." [AR, at 426.] The doctor also gave her "light duty job restrictions from a spine standpoint." [AR, at 426.] A workers' compensation work status report dated August 2, 2011 and completed by Dr. Ellis indicates that Plaintiff is able to return to work with the following restrictions: carrying and lifting restricted to ten pounds, occasional stairs, occasional squatting

and kneeling, no overhead work, no repetitive bending or twisting, and no limits on sitting, standing, or walking.  [AR, at 567.]

Plaintiff continued to see Dr. Griffin.  On August 17, 2011, Dr. Griffin noted that she still had pain in her left arm to shoulder and in her lower back and right buttocks but that she was sleeping better and off Zoloft.  [AR, at 321–22.]  On October 12, 2011, Dr. Griffin noted that she had been advised to go to the pain clinic and that she was walking every day and losing weight.  [AR, at 316.]  A physical exam showed muscle spasms in the left upper trapezius.  [AR, at 317.]  On December 15, 2011, Dr. Griffin noted that Plaintiff was waiting for approval for cortisone shots at the pain clinic and that she was walking five-to-six miles per day.  [AR, at 312.]  On February 15, 2012, there were no significant changes in Plaintiff's condition, and Dr. Griffin completed a workers' compensation work status report indicating that Plaintiff was "unable to perform any work at this time."  [AR, at 306–07, 568.]  On April 18, 2012, Dr. Griffin's report again indicated no significant changes in Plaintiff's condition.  [AR, at 301–02.]

On June 22, 2012, Plaintiff underwent psychological consultation related to her claim for disability benefits.  [AR, at 364–68.]  The report states that Plaintiff's "memory and concentration were mildly below average but not significantly impaired" and that she "gave no evidence of any psychiatric condition."  [AR, at 66.]  On June 23, 2012, Plaintiff had an internal medicine consultative examination with Dr. Chukwu related to her claim for disability benefits.  [AR, at 373–79.]  Dr. Chukwu's report states that Plaintiff has no limitation in walking, is able to stand for thirty minutes to one hour, and can sit for thirty minutes.  [AR, at 374.]  It also states that her grip strength was normal in both hands and that Plaintiff was able to fully extend the hands, make fists, and oppose the fingers and had normal ability to grasp and manipulate objects.  [AR, at 375.]  The range of motion of the cervical spine was normal but the range of motion of

the left shoulder and lumbar spine was abnormal.  [AR, at 375.]  On June 23, 2012, Plaintiff had an x-ray of her left shoulder, cervical spine, lumbar spine, and left hip, which were "[e]ssentially unremarkable."  [AR, at 370–72, 380.]

Plaintiff continued seeing Dr. Griffin.  On August 21, 2012, Dr. Griffin noted that Plaintiff slipped and fell on August 18, 2012 while at a casino for dinner and that she had a swollen right ankle and right arm.  [AR, at 643, 712.]  Dr. Griffin also completed a workers' compensation work status report and indicated that Plaintiff was "unable to perform any work at this time" due to cervical and lumbar radiculopathy.  [AR, at 701.]  On October 23, 2012, Dr. Griffin reported that Plaintiff's pain from falling at the casino was "[n]ot really an issue now" but that Plaintiff still had pain in her left arm to shoulder, left hip, lower back, and right buttock. [AR, at 709.]  On December 18, 2012, Dr. Griffin noted that Plaintiff was walking three miles per day but still had pain in her left arm to shoulder, left hip, lower back, and right buttock.  [AR, at 706.]  On March 5, 2013, Dr. Griffin noted that Plaintiff still had pain in her left arm to shoulder and in her hips, lower back, and right buttock.  [AR, at 703.]  He wrote that Plaintiff "appears to be disabled from a pain standpoint" and that "she is no longer able to Do [sic] her previous job because of pain with standing, pain with sitting and pain with most any activity." [AR, at 708.]  On March 5, 2013, Dr. Griffin filled out another workers' compensation work status report indicating that Plaintiff was "unable to perform any work at this time" due to cervical and lumbar radiculopathy.  [AR, at 702.]

### D.    Hearing Before the ALJ

#### 1.    Plaintiff's Testimony

Plaintiff appeared before the ALJ on April 11, 2013.  [AR, at 40.]  Plaintiff described the two accidents that caused her to leave her last job at Homeowner's Bargain Outlet.  [AR, at 42–

44.]  She explained that she has applied for other jobs since she stopped working in 2010 and interviewed with Johnson Controls in 2011 but was not offered a job.  [AR, at 45–46.]  Plaintiff stated that she told the potential employers that she was taking medication, still in therapy, had "all these doctor visits and so forth and it seems to be a problem."  [AR, at 46.]  She stated that the last application she filed was "probably" in December 2012 for a management position but that she did not receive an interview.  [AR, at 49.]  The ALJ asked Plaintiff: "And if at all those places you applied, if anyone would have offered you a job, would you have taken it?"  Plaintiff responded that she would have taken the job if her potential employer could "live with * * * me taking off from work, me with my limitations[.]"  [AR, at 65.]

Plaintiff testified that therapy has helped with the pain in her left arm and shoulder but that she was not currently receiving physical therapy.  [AR, at 44, 50.]  Plaintiff stated that she was taking ibuprofen, a muscle relaxer, and a sleep medication.  [AR, at 50.]  She testified that her doctor wanted her to go to a pain clinic for cortisone shots but that she was not currently in a pain clinic or getting cortisone shots.  [AR, at 50.]  She explained that she was waiting for her attorney to get these shots approved so that she could continue treatment.  [AR, at 50.]

Plaintiff testified that she lives alone in her own apartment and that she can climb the eight stairs up to her apartment using the handrail to assist her.  [AR, at 63.]  She does her own chores, and her friends help her with tasks that she is not capable of doing.  [AR, at 52, 64.]  She does not drive often because her medication makes her dizzy and because driving causes pain, but she can drive for about about half an hour at a time.  [AR, at 62.]

Her daily activities consist of reading, walking, and sleeping.  [AR, at 52.]  She testified that she walks anywhere from "three to five to seven miles" per day in half hour intervals and that she stops after half an hour of walking because she gets tired.  [AR, at 52.]  Plaintiff testified

that her sleep is interrupted even with sleep medication and that she sleeps for about two hours without interruption and then it takes her about an hour to fall back asleep. [AR, at 56.] Each night, she sleeps approximately six hours. [AR, at 57.] Plaintiff testified that she is fatigued all of the time and takes about three naps per day, which vary in length from half an hour to one hour. [AR, at 59.]

Plaintiff stated that she goes out to dinner with her friends. [AR, at 66.] In June 2010, she attended her daughter's wedding, but she needed assistance getting out of a chair. [AR, at 52–54.] In 2012 she slipped and fell after having dinner in a casino. [AR, at 66–67.]

### 2. The Testimony of the Vocational Expert

Pamela Tucker, a vocational expert ("VE") also testified at the hearing. [AR, at 68–71.] The ALJ presented the VE with a hypothetical of a person of Plaintiff's age, education, and work experience. [AR, at 69.] The VE was to assume that the hypothetical person could lift and carry twenty pounds occasionally, ten pounds frequently; can push and pull to the same extent that she can lift and carry; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; can occasionally reach above the shoulder with the left non-dominant arm; and can stand, walk, or sit six hours in an eight-hour workday. [AR, at 68–69.] The VE testified that this hypothetical individual could not engage in Plaintiff's past work. [AR, at 68.] However, the VE testified that this hypothetical individual with this functional capacity could perform other light, unskilled jobs, such as a cashier (37,000 positions in Illinois, 900,000 positions nationally), office helper (2,100 positions in Illinois, 55,000 positions nationally), or mail clerk (2,700 positions in Illinois, 70,000 positions nationally). [AR, at 69.]

The ALJ then asked if the hypothetical individual would be able to perform "these jobs or any other jobs in the national or regional economy on a sustained basis" if the individual would

be "absent from work an average of one and a half days per month." [AR, at 70.] The VE responded, "No, there would not be any work" and explained that generally an employee at these jobs would not be permitted to miss more than one day of work per month. [AR, at 70.]

## II.     Disability Standard

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and related regulations. The Act defines "disability" as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be found disabled, the claimant's impairment must be of such severity that it not only prevents her from doing her previous work, but also prevents her from engaging in any other kind of substantial gainful work which exists in significant numbers in the national economy, considering age, education, and work experience. § 423(d)(2)(A).

Social Security regulations enumerate a five-step inquiry to evaluate whether the claimant is entitled to disability insurance benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also *Stage v. Colvin*, 812 F.3d 1121, 1124 (7th Cir. 2016). The five-step inquiry requires the ALJ to evaluate, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], see 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), as amended (Dec. 13, 2000). An affirmative answer leads to the next step, or for Steps 3 and 5, to a finding that the claimant is disabled. *Id.* A negative answer ends the inquiry and leads to a determination that a claimant is not disabled, except for at Step 3. *Id.* At Steps 4 and 5, the ALJ must consider the claimant's residual

functional capacity ("RFC"). "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000. The ALJ must assess the RFC based on all of the relevant record evidence. *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The burden of proof is on the claimant for Step 1 through Step 4. *Clifford*, 227 F.3d at 868. The burden shifts to the Commissioner at Step 5. *Id.*

## III.    The ALJ's Opinion

In an opinion dated April 29, 2013, the ALJ concluded that Plaintiff is not disabled. [AR, at 32–33.] At Step 1, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since June 3, 2010, the alleged onset date. [AR, at 22.] At Step 2, the ALJ found that Plaintiff has the following severe impairment: degenerative disc disease of the cervical spine. [AR, at 22.] The ALJ also found that Plaintiff has hypertension but classified this as a nonsevere impairment. [AR, at 22.] Further, the ALJ found that Plaintiff suffers from depression, a nonsevere mental impairment. [AR, at 23–24.] At Step 3, the ALJ determined that Plaintiff's impairment or combination of impairments does not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [AR, at 24.] The ALJ noted that although Plaintiff has a history of degenerative disc disease of the cervical spine, there is no evidence that this meets or equals a listed impairment because "there is no evidence of a disorder of the spine resulting in compromise of a nerve root or the spinal cord with all additional criteria required." [AR, at 24.]

Before Step 4, the ALJ found that Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except that Plaintiff can "occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl," and that Plaintiff is "limited to occasional reaching with the non-dominant left upper

extremity." [AR, at 24.] In reaching this RFC conclusion, the ALJ considered all of Plaintiff's symptoms and the extent to which these symptoms could be reasonably accepted as consistent with the objective medical evidence and other evidence. [AR, at 24.] The ALJ explored Plaintiff's testimony from the hearing, including Plaintiff's description of the two work accidents that caused her injuries, her reports of pain and trouble sleeping, the improvement she saw with physical therapy, her daily activities, her social activities, and the fact that Plaintiff "noted that * * * she may have taken a job if she could have taken off for doctor's appointments and therapy." [AR, at 25.]

The ALJ summarized Plaintiff's medical history and various doctors' appointments, but did not discuss the physical therapy that Plaintiff received for her back from March 2010 through May 2010. [AR, 25–29; see AR, at 582–85.] The ALJ referenced Plaintiff's statement at a follow-up doctor's appointment on November 4, 2010 that "she was going to return to work in October 2010, but the insurance company wanted a second opinion, and she was undergoing more tests as well as a cortisone shot in the back." [AR, at 27, 347.] The ALJ noted that Plaintiff reported improvement with treatment after her March 2010 injury and continued to work until June 2010. [AR, at 30.] The ALJ explained that Plaintiff received continuing care for her arm, back, neck, and buttocks pain, but that examination findings were "generally normal with only some tenderness and muscle spasms" and that x-rays have revealed "generally minimal findings." [AR, at 30.] The ALJ acknowledged that Plaintiff has received some treatment for depression and anxiety but noted that Plaintiff "generally reported improvement on medication." [AR, at 30.]

The ALJ gave "great weight to the State agency physicians as they are generally consistent with the evidence of the record." [AR, at 30.] The ALJ also considered "various

opinions that [Plaintiff] is unable to work," citing the workers' compensation status reports completed by Dr. Griffin. [AR, at 30.] The ALJ gave "some weight" to these opinions, "to the extent that they state that the claimant is unable to perform previous jobs." [AR, at 30.] The ALJ concluded, however, that "the opinion that claimant appears disabled is inconsistent with all evidence, as objective findings and findings on examination are generally mild, the claimant responded to conservative treatment, and she continued to engaged in a wide range of daily activities." [AR, at 30.] The ALJ noted that Plaintiff also received return to work opinions with varying levels of lifting/carrying, grasping/clasping, and postural limitations. [AR, at 31; see also AR, at 564, 567.] For example, in October 2010, Dr. Griffin opined that Plaintiff "could return to work, but was limited to lifting and/or carrying 15 pounds occasionally, with no limitations on sitting, standing, or walking, and occasional postural limitations." [AR, at 31.] The ALJ explained that other than the lifting limitations and limitations on grasping/clasping bilaterally, Dr. Griffin's opinion is "generally consistent" with the ALJ's RFC assessment. The ALJ noted that she did not include a limitation to bilateral grasping/clasping because there is no evidence of any limitations on the right upper extremity and although Plaintiff has some limitations with the left upper extremity, she was able to perform fine and gross manipulation movements on consultative examination. [AR, at 31.]

After careful consideration of the evidence, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." However, the ALJ also concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her alleged] symptoms are not entire credible." [AR, at 25.] The ALJ explained that although Plaintiff has some limitations, she continues to engage in a wide range of daily activities. Plaintiff is able to perform chores, prepare simple meals, and shop

for food, although a friend comes over to help her with some tasks. She goes to dinner with friends regularly, including a dinner at a casino, attended her daughter's wedding, and attends church and other social events. She walks three-to-seven miles per day and can walk for at least half an hour at a time. The ALJ noted that although Plaintiff reported limitations sitting, standing, and lifting on consultative examinations, she reported no problems walking. The ALJ also pointed out that Plaintiff "has applied for jobs since the alleged onset date, and she testified that she would have been able to work those jobs if they allowed her to take time off work for doctor [sic] appointments and physical therapy sessions." [AR, at 29.] The ALJ concluded that "[o]verall, the claimant's reported activities of daily living are not entirely consistent with those of a totally disabled individual. To the extent that they support additional limitations, I find other evidence more probative."

The ALJ stated that in sum, her RFC assessment "is supported by the medical findings, nature and frequency of treatment, the claimant's activities, opinion evidence and other factors discussed above." She opined that "[t]o the extent claimant alleges greater limitations, her testimony is not fully credible." [AR, at 31.]

At Step 4, the ALJ determined that Plaintiff is unable to perform past relevant work as a retail manager, which the VE testified is "medium exertional work." [AR, at 31.] At Step 5, the ALJ considered Plaintiff's age, education, work experience, and RFC and concluded that Plaintiff is able to perform jobs that exist in significant numbers in the national economy. [AR, at 32.] The ALJ did not at this point, nor anywhere else in her opinion, explicitly consider the VE's testimony that a person in Plaintiff's position who missed one and a half days of work per month would be unable to work.

## IV.    Standard of Review

The Social Security Act authorizes judicial review of the final decision of the SSA. 42 U.S.C. § 405(g).    An ALJ's decision "must be upheld if it is supported by substantial evidence, which has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"    *Ghiselli v. Colvin*, 2016 WL 4939535, at *3 (7th Cir. Sept. 16, 2016) (quoting *Pepper v. Colvin*, 712 F.3d 351, 631 (7th Cir. 2013)).    "[A]n ALJ must articulate, at a minimum, his analysis of the evidence to allow a reviewing court to trace the path of his reasoning and be assured that he considered the importance evidence."    *Gravina v. Astrue*, 2012 WL 3006470, at *3 (N.D. Ill. July 23, 2012) (citing *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004)).    The ALJ is not required to address every piece of testimony and evidence but must "provide some glimpse into the reasoning behind [the] decision to deny benefits."    *Id.*    In other words, the ALJ must build "an accurate and logical bridge" from the evidence to her conclusion.    *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (citation and internal quotation marks omitted).

A court reviews the entire administrative record, but does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner."    *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citation and internal quotation marks omitted).    If reasonable minds can differ as to whether the applicant is disabled, the court must uphold the decision of the ALJ.    *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

Federal courts have the statutory power to affirm, reverse, or modify the SSA's decision, with or without remanding the case for further proceedings.    42 U.S.C. § 405(g); *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011).    Thus, the Court may remand the case with

instructions for the Commissioner to calculate and award benefits to the applicant. *Allord*, 631 F.3d at 415. However, an award of benefits if appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Id.*

## V.    Analysis

Plaintiff argues that the ALJ erred at Step 5, which requires the ALJ to determine Plaintiff's RFC and to ascertain whether there are a significant number of jobs that Plaintiff could perform. *Clifford,* 227 F.3d at 868. Plaintiff contends that the exhibits admitted into evidence by the ALJ show numerous doctors' visits by Plaintiff during the relevant period and that her absences from work would far exceed the one day per month that would be tolerated by employers. [27, at 3–4.] Plaintiff argues that the VE unequivocally testified that there would not be any work for a person in Plaintiff's position who would be absent from work an average of one and a half days per month. Thus, in Plaintiff's view, the ALJ's finding that jobs exist that Plaintiff could perform and her denial of disability benefits are not supported by substantial evidence.

The Court agrees that the ALJ erred in overlooking the disconnect between (1) Plaintiff's testimony that her need to attend frequent doctors' visits makes it difficult for her to work and (2) the VE's testimony that potential employers would not tolerate more than one absence per month. See *Infusino v. Colvin*, 2014 WL 266205, at *12 (N.D. Ill. Jan. 23, 2014) (remanding to the ALJ for further proceedings, in part because the ALJ erred in overlooking the "potentially work-preclusive nature of Plaintiff's history of frequent absences from work"); *Sydnor v. Astrue*, 2012 WL 3308876, at *9 (N.D. Ill. Aug. 13, 2012) (explaining that "the totality of the claimant's limitations must be considered," which includes "limitations associated with deficiencies of

concentration, persistence, and pace," and noting that "absence from work two to three times per month would be in excess of what is tolerated by employers in both the private and public sector" (citations and internal quotation marks omitted)).

The ALJ makes several references to Plaintiff's potential need to attend frequent doctors' appointments. First, when describing Plaintiff's testimony at the hearing, the ALJ acknowledged that Plaintiff "noted that * * * she may have taken a job if she could have taken off for doctor's appointments and therapy." [AR, at 25.] Second, in assessing Plaintiff's credibility, the ALJ states that Plaintiff "has applied for jobs since the alleged onset date, and she testified that she would have been able to work those jobs if they allowed her to take time off work for doctor [sic] appointments and physical therapy sessions." [AR, at 29.] Third, the ALJ stated that her RFC assessment was supported in part by the "nature and frequency of treatment." [AR, at 31.]

However, notably absent from the ALJ's opinion is a discussion of the VE's testimony that there would be no jobs available for a person in Plaintiff's position who missed one and a half days of work per month. [AR, at 70.] The absence of any explicit consideration of this part of the VE's testimony is particularly unexpected given the ALJ's reliance on the first part of the VE's testimony, in which the VE stated that Plaintiff could perform other light, unskilled jobs, such as a cashier, office helper, or mail clerk. [AR, at 69.] *Connor v. Shalala*, 900 F. Supp. 994, 1004 (N.D. Ill. 1995) (remanding and concluding that since the VE's testimony was "determinative to the ALJ's decision of 'not disabled,'" the ALJ's failure to address the VE's testimony about employers' tolerance of absences from work "must be remedied"). The ALJ stated that "*[b]ased on the testimony of the vocational expert*, I conclude that *** the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." [AR, at 32 (emphasis added).] However, the ALJ did not explain why she

accepted the first part of the VE's testimony about the availability of light, unskilled jobs, but did not even consider the second part of the VE's testimony about tolerated absences. See *Mandella v. Astrue*, 820 F. Supp. 2d 911, 924 (E.D. Wis. 2011) (concluding that the ALJ did not build "an accurate and logical bridge" from the evidence to his conclusion where the VE testified that plaintiff would be precluded from working if medical reasons caused her to miss work four or more days per month and the ALJ never considered plaintiff's projected monthly absence from work). Although an ALJ need not discuss every piece of evidence in the record, the ALJ must "confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); see also *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Hamilton v. Colvin*, 2015 WL 536127, at *11 (N.D. Ill. Feb. 9, 2015).

Defendant argues that Plaintiff has failed to show that she could not attend her appointments before or after work hours or on her scheduled days off work. [32, at 6.] However, as Plaintiff correctly points out, the Commissioner bears the burden at Step 5 and "must present evidence establishing that [Plaintiff] possesses the residual functional capacity to perform work that exists in a significant quantity in the national economy." *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). Defendant also argues that the ALJ properly applied the five-step sequential evaluation process and analyzed the relevant medical opinions, Plaintiff's subjective complaints and allegations, and other record evidence. [32, at 2–5.] The Court acknowledges the substantial effort reflected in the ALJ's twenty-page single-spaced opinion and the fact that the record as a whole might reasonably be read to meet the substantial evidence standard if the ALJ had not overlooked relevant evidence about Plaintiff's ability to adhere to a full-time work schedule. See *Infusino*, 2014 WL 266205, at *12. At the end of the day, however, the ALJ is required to address evidence that does not support her ultimate conclusion.

*Indoranto*, 374 F.3d at 474; *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be examined, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight." (citation and internal quotation marks omitted)).

Perhaps there was a perfectly good reason for not according controlling weight to or otherwise discounting Plaintiff's testimony that her need for frequent doctors' visits precludes her from working and the VE's testimony that absences of more than one day per month would be work-preclusive. See *Bouchard v. Barnhart*, 38 F. App'x 332, 336 (7th Cir. 2002) (holding that the ALJ was entitled to give less weight to the treating physician's opinion that plaintiff would be unable to maintain employment, given her limitations and need for frequent absences from work, as long as the ALJ properly demonstrated that he considered the merits of the treating physician's opinion along with the opinions of other doctors). "If so, it was incumbent upon the ALJ to articulate that reason; we cannot in our limited review guess at or supply it." *Infusino*, 2014 WL 266205, at *12. Without the ALJ's assessment of this evidence, the Court cannot conclude that her opinion rests on substantial evidence.

Therefore, the case is remanded to the SSA for further proceedings. Plaintiff requests that the Court remand the case with instructions to grant Plaintiff's application for disability benefits. [27, at 4.] However, the Court can only remand the case with instructions for the Commissioner to calculate and award benefits if "all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord*, 631 F.3d at 415. Here, it is not clear from the record that all of the factual issues involved in the entitlement determination have been resolved. Specifically, it is not apparent how many days of work Plaintiff will be expected to

miss per month. At the ALJ hearing on April 11, 2013, Plaintiff testified that she was not receiving physical therapy at that time and that she was waiting for approval to go to a pain clinic for cortisone shots. [AR, at 50.] She states in her complaint, filed on November 19, 2014, that she gets three cortisone shots per year. Aside from these three cortisone shots per year, it is unclear what other medical appointments or reasons could cause Plaintiff to be frequently and routinely absent from work. In her letter to the Appeals Council of the SSA, Plaintiff argued that "[d]uring her testimony [before the ALJ], [Plaintiff] noted regular physical therapy sessions and doctors' visits *** [which] took place at the rate of 4-5 per month." [AR, at 14.] However, it is not apparent that this rate of absence is supported by the medical records. Thus, this is a factual issue for the ALJ to consider on remand.

## VI.    Conclusion

For all of the reasons set forth above, the Court grants in part Plaintiff's motion and remands for additional proceedings consistent with this opinion. Namely, the ALJ should incorporate into her analysis an assessment of whether Plaintiff has established that she will consistently be absent from work for medical reasons for a certain number of days per month and consideration of the VE's testimony that absences of more than one day per month would be preclusive of maintaining gainful employment.

Dated: December 5, 2016                    _____
                                           Robert M. Dow, Jr.
                                           United States District Judge